[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

———————————————

No. 22-10419

———————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JONATHAN GUERRA BLANCO,
a.k.a. Abu Zahra Al-Andalusi,

Defendant-Appellant.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cr-20245-RNS-1

———————————————

Before JORDAN, LAGOA, and MARCUS, Circuit Judges.

JORDAN, Circuit Judge:

Jonathan Guerra Blanco appeals his 192-month sentence following his guilty plea to attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). First, he contends that at sentencing the government improperly used evidence obtained from testimony he had provided pursuant to a proffer agreement and argues that the district court erred in not holding an evidentiary hearing on the matter. Second, he challenges the application of a 12-point sentencing enhancement under U.S.S.G. § 3A1.4(a) for promoting a federal crime of terrorism. Third, he asserts that the district court erred by not applying a 3-level reduction for acceptance of responsibility from his maximum statutory sentence of 240 months.

After a review of the record, and with the benefit of oral argument, we affirm.

## I

In early December of 2020, the government charged Mr. Guerra by information with one count of attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). Later that month he pled guilty and agreed to the government's factual proffer.

## A

The facts set out below are taken from the factual proffer used to support Mr. Guerra's guilty plea and the unobjected-to factual narrative in the presentence investigation report.

ISIS, or the "Islamic State of Iraq and al-Sham," is the infamous foreign terrorist organization responsible for countless terrorist attacks across the world. Mr. Guerra knew what ISIS stood for, and he also knew that the U.S. Secretary of State had designated ISIS as a foreign terrorist organization.

Sometime between October of 2019 and September of 2020, Mr. Guerra ran two unofficial ISIS media networks primarily directed at Spanish speakers. One of those networks was called "Muntasir Media." Mr. Guerra's operation of the media networks involved the production and dissemination of ISIS propaganda, recruiting materials, and instructional guides for committing acts of terror.

ISIS has relied more on these sorts of decentralized networks due to significant losses in the past few years. Indeed, ISIS has said that the propaganda work on its behalf is just as valuable to its efforts as are ISIS militants committing acts of violence.

Via the two media networks, Mr. Guerra produced and disseminated the following:

◆ A November 2019 video threatening terrorist attacks on the Spanish National Police and the Spanish subway system. The video featured a masked individual stating that ISIS cells in Spain

remained intact despite the arrest of a Muntasir-affiliated ISIS operative.

◆ A December 2019 video threatening and encouraging attacks on behalf of ISIS in Madrid, Spain.  The video included footage of a popular public square in Madrid with a narration: "don't let them celebrate in peace," and "kill them, give them jihad!"

◆ A second and similar December 2019 video threatening attacks in Spain and calling for supporters to take up arms for ISIS.

◆ A February 2020 video, titled "Called to Islam," threatening "non-believers" to convert to a radicalized version of Islam. The video featured footage of a well-known hotel in Miami and the Las Vegas Strip, along with clips of a suicide bomber's farewell address and an ISIS execution.

◆ A February 2020 instruction manual titled "Open Source Jihad [1] . . . How to Make a Bomb in the Kitchen of Your Mom." The manual provided instructions in Spanish on how to build a home-made bomb for use in a terrorist attack.

◆ A February 2020 instruction manual titled "Open Source Jihad 2 . . . The Ultimate Mowing Machine."  The manual provided instructions, in Spanish, on how to effectively conduct a vehicle attack against a pedestrian crowd.  The manual had long been published in English, but Mr. Guerra provided a Spanish translation and included original content on how to avoid detection online by the authorities.

To help him operate the media networks, Mr. Guerra recruited other ISIS sympathizers with foreign language abilities. Unbeknownst to Mr. Guerra, however, some of his prospective recruits were undercover FBI operatives and sources. Mr. Guerra told one such recruit that "[w]ithout us . . . [ISIS] in the online world is dead," and that, although he was loyal to ISIS, he could not "express things which are clearly [a] 'crime' where I am." Using coded language, Mr. Guerra asked another recruit to help him translate an instruction manual on building a mail bomb.

Mr. Guerra was skilled at obfuscating his true identity and location online. He used a combination of tools (e.g., virtual private networks and encrypted messaging platforms) to evade detection by the authorities. And he instructed his recruits to do the same.

Although skilled at concealing his identity online, Mr. Guerra eventually slipped up by revealing his true identity to a recruit (an undercover FBI operative) whom he was pursuing romantically. On a trip to Miami on September 11, 2020, to meet that recruit, Mr. Guerra was arrested by the authorities. A subsequent search of his home revealed the same software and hardware that he instructed his recruits to use for online anonymity and a hand-drawn ISIS flag under his mattress.

**B**

Around the time of the plea, the government executed a proffer letter agreement with Mr. Guerra (and his counsel) setting out the parameters of a debriefing. *See* D.E. 82, Exh. A. The letter

6                    Opinion of the Court                22-10419

agreement required Mr. Guerra to give the government a truthful account and to provide a password for the computer and electronic devices that were seized at the time of his arrest. *See id.* at 1.

For its part, the government "agree[d] that no statements made by [Mr. Guerra] during the debriefing(s) w[ould] be offered into evidence against him as part of any government direct case," but "remain[ed] free to use information derived from the debriefing directly or indirectly for the purpose of obtaining leads to other evidence, which may be used against [him] in any investigations or prosecutions." *Id.* Mr. Guerra "expressly waive[d] any right to claim that such evidence should not be introduced because it was obtained as a result of the debriefing." *Id.* This "provision [wa]s necessary in order to avoid the necessity for a *Kastigar* hearing." *Id.*[1]

In addition, the government's "agreement to not use statements against [Mr. Guerra] made during th[e] proffer d[id] not extend to statements concerning violent acts, or violence in any form." *Id.* at 1–2.[2]

---

[1] *See generally Kastigar v. United States*, 406 U.S. 441, 453 (1972) (holding that the government cannot use, directly or indirectly, compelled testimony obtained under a grant of statutory immunity in the prosecution of the witness who was compelled to testify).

[2] In an email to Mr. Guerra's counsel, the Assistant U.S. Attorney stated that "[t]his letter would cover what we obtain from any devices we access with the password(s) provided. The letter specifically excludes any violence." D.E. 82, Exh. B.

22-10419                Opinion of the Court                7

With respect to sentencing, the letter agreement contained additional language.    It stated that "pursuant to [U.S.S.G.] § 1B1.8 . . . none of the information provided to the [government] during these debriefings shall be used against [Mr. Guerra] in determining the applicable guideline range." *Id.* at 2.[3]

## C

The presentence investigation report recommended a total offense level of 37 for Mr. Guerra.  This resulted from (a) a 12-level increase to the base offense level of 26 under U.S.S.G. § 3A1.4(a) because the offense involved, or was intended to promote, a federal crime of terrorism; (b) a 2-level increase to the base offense because he served as an organizer or leader under U.S.S.G. § 3B1.1(c); and (c) a 3-level decrease for acceptance of responsibility under U.S.S.G. § 3E1.1(a)–(b).

The terrorism enhancement also increased Mr. Guerra's criminal history category from I to VI, which, when combined with a total offense level of 37, yielded an advisory guideline imprisonment range of 360 months to life.  But because the statutory

---

[3]As relevant here, § 1B1.8(a) provides as follows:  "Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement."  This provision, however, does not restrict the use of information "known to the government prior to entering into the cooperation agreement."  § 1B1.8(b)(1).

maximum for the offense was 240 months, the guideline term also became 240 months.  *See* U.S.S.G. § 5G1.1(a)

Mr. Guerra raised two objections to the report before his sentencing hearing.

First, he objected to the application of the terrorism enhancement.  He asserted that a violation of the material support statute does not *per se* warrant the imposition of the terrorism enhancement.  For that enhancement to apply, he argued, the government had to prove by clear and convincing evidence that his conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." D.E. 45 at 5 (quoting 18 U.S.C. § 2332b(g)(5)(A)). And that, he further maintained, required a showing of specific intent.  *See id.* at 7.

Second, he objected to applying the 3-level reduction for acceptance of responsibility to the adjusted offense level of 40 (resulting in a total offense level of 37) rather than to the 240-month maximum statutory sentence.  *See id.* at 18.  He argued that if the 3-level reduction was not applied to the 240-month maximum statutory sentence, his acceptance of responsibility would be rendered "effectively meaningless." *Id.*  He maintained that the district court could depart or vary to make his acceptance of responsibility meaningful under *United States v. Rodriguez*, 64 F.3d 638, 643 (11th Cir. 1995) ("[A] district court has the discretion to reward a defendant's acceptance of responsibility by departing downward

when [U.S.S.G.] § 5G1.1(a) renders [U.S.S.G.] § 3E1.1 ineffectual in reducing the defendant's actual sentence."). *See* D.E. 45 at 18–19.

Mr. Guerra also filed a motion for a downward departure or variance pursuant to the 18 U.S.C. § 3553(a) factors. In support of a sentence below the advisory guidelines, he pointed to his lack of criminal history, his "very serious medical and psychological ailments," and his acceptance of responsibility. *See* D.E. 76 at 2 (filed under seal).

The government opposed Mr. Guerra's objections and motion for a downward departure or variance. In part, the government relied on some materials obtained from Mr. Guerra's computer, including a video threatening the assassination of a Spanish judge for which Mr. Guerra had inserted subtitles in English. *See* D.E. 102 at 14. One of the subtitles reads "you will die with a sticky bomb." *See id.* at 34; D.E. 94-4 at 5.[4]

In response to the government's opposition, Mr. Guerra filed an emergency motion for a *Kastigar* hearing. *See generally United States v. Schmidgall*, 25 F.3d 1523, 1528 (11th Cir. 1994) ("[W]hen presented with a *Kastigar* challenge, a court's task is to determine whether any of the evidence used against the defendant was in any way derived from his compelled immunized

---

[4] The government knew that Muntasir Media disseminated the video before the execution of the proffer letter agreement, but only learned that Mr. Guerra had inserted English subtitles after looking at his computer by using the password he provided. *See, e.g.,* D.E. 102 at 18, 31–32 (statements by the Assistant U.S. Attorney and by Mr. Guerra's counsel).

testimony."). He asserted that the government was improperly using evidence—such as the video threatening the assassination of a Spanish judge and three documents titled "Open Source Jihad"—that it had obtained from his immunized proffer. *See* D.E. 82 at 2–3.

## D

The sentencing hearing began with argument on Mr. Guerra's motion for a *Kastigar* hearing.

Mr. Guerra explained that, pursuant to the proffer letter agreement, he provided the government with the passwords needed to access his computer and electronic devices, which contained incriminating evidence. He argued that the government had agreed not to use any of the evidence it obtained against him, including at his sentencing. He understood the letter agreement to not cover any violent acts that he personally participated in—had there been evidence of him planting a bomb, that would be fair game—but that it would cover his translation and dissemination of materials containing calls for violence.

Importantly, however, Mr. Guerra clarified that he was not objecting, under the proffer letter agreement, to the government's presentation of the two February 2020 instruction manuals—the ones he translated and published in Spanish on how to build a home-made bomb (Open Source Jihad 1) and how to use a vehicle against a pedestrian crowd (Open Source Jihad 2)—because the government knew about them prior to his arrest. His objection was limited to the use of two videos—one threatening the

assassination of a Spanish judge and another in which he pledged allegiance to ISIS.

The government responded that the proffer letter agreement's exclusion for "violent acts, or violence in any form," applied to the evidence it sought to introduce. As to the video threatening the assassination of a Spanish judge, the government asserted that it knew before execution of the letter agreement that Muntasir Media had disseminated the video. Mr. Guerra agreed the government knew about the video, but asserted that it did not learn about his insertion of English subtitles until it searched his computer using the password he provided.

The district court denied Mr. Guerra's motion for a *Kastigar* hearing. It found that the objected-to evidence fell within the proffer letter agreement's exclusion for evidence concerning violent acts. The court also ruled that the Assistant U.S. Attorney's email to Mr. Guerra's counsel was parol evidence that it could not consider given that the letter agreement was unambiguous.

The next matter taken up at the hearing was Mr. Guerra's objection to the terrorism enhancement under U.S.S.G. § 3A1.4(a). The government introduced four exhibits in support of the enhancement: (1) Open Source Jihad 1, the manual on home-made bombs; (2) Open Source Jihad 2, the manual on using a vehicle against a pedestrian crowd; (3) Open Source Jihad 3, a manual on how to use arson to commit a terrorist act; and (4) the video threatening the assassination of a Spanish judge. All four were produced

and disseminated by Muntasir Media—the network that Mr. Guerra admitted to "direct[ing] and coordinat[ing]."

Open Source Jihad 1 called itself "America's worst nightmare" and a "disaster for the repressive imperialistic nations." Open Source Jihad 2 explained that:

> This idea [of driving a truck through a crowd] could be implemented in countries like Israel, the U.S., . . . and other countries where the government and public sentiment is in support of the Israeli occupation of Palestine, the American invasion of Afghanistan and Iraq . . . . In such countries, we may strike at the public at large. As long as they target our noncombatants, we will target theirs.

Mr. Guerra then called Dr. Michele Quiroga, a psychologist, as an expert witness to testify about his alleged inability to form the requisite intent for the terrorism enhancement. Dr. Quiroga explained that Mr. Guerra was "wired differently" due to his various health conditions, including autism. She concluded that he did not form the "specific intent to retaliate against the government" and was instead lured into the fold as a result of his deep desire for acceptance. But she also conceded that he knew what a crime is "at a certain level."

The district court overruled Mr. Guerra's objection and applied the terrorism enhancement. The court did not find credible Dr. Quiroga's testimony that Mr. Guerra lacked specific intent. It instead reasoned that Open Source Jihad 1 and Open Source Jihad 2 "on their own establish[ed]" that "the offense was calculated to

influence or affect the conduct of government by intimidation or coercion or retaliat[ion] against government conduct." In its view, the references to western governments in both exhibits made clear that Mr. Guerra was not promoting the killing of people "for no reason whatsoever, but in retaliation for the United States['] public support of Israel and [its] invasion of Afghanistan and Iraq." The court stressed that it was making "a clear finding that, even without [the video threatening the assassination of the Spanish judge], there is more than enough evidence to meet the government's burden in this case." The court added that this video made the finding "overwhelming, but even without [it], there's more than sufficient evidence to meet the government's burden."

The district court then addressed Mr. Guerra's objection to applying the 3-level acceptance of responsibility reduction to the adjusted offense level of 40 rather than to the statutory maximum sentence of 240 months. The court considered that to be a "variance request . . . . because he's not effectively getting the value of it[,]" but not an issue as to "calculation" of the advisory guidelines. Seemingly in agreement, Mr. Guerra again brought up the issue in the context of arguing for a variance under 18 U.S.C. § 3553(a) *after* the court had already ruled on his objections to the guideline range. The court adopted the guideline calculations in the presentence investigation report as previously described—240 months.

Mr. Guerra presented testimony from Dr. Jaime Ghitelman, an expert in cardiology, on his various health conditions. The district court later heard directly from Mr. Guerra and his mother.

In support of a variance under § 3553(a), Mr. Guerra argued that the district court should "consider his acceptance of responsibility" by applying the 3-level reduction to the statutory maximum sentence of 240 months, which would yield a guideline range of 151–188 months.  Mr. Guerra cited to a previous case involving money laundering in which the district court had done something similar.  From that proposed guideline range, Mr. Guerra requested a sentence of 78 months because of his serious health conditions, his age at the time of the crime, and his cooperation.

After hearing from the parties, the district court considered and discussed the § 3553(a) factors.  In its view, the offense "was a very serious" one that warranted "a significant prison sentence" to promote respect for the law, to protect the public, and to deter others who might consider getting involved in similar offenses.  But it also found that there were "several factors that weigh[ed] in mitigation of a lengthy sentence."  It departed under U.S.S.G. § 5H1.4 due to Mr. Guerra's serious health conditions, including his neurodevelopmental disorder and level 3 autism.  It also found mitigating Mr. Guerra's lack of prior arrests, age and immaturity, psychological trauma, and acceptance of responsibility.  And it explained that "the way the guidelines have worked out, he doesn't really get credit for the acceptance of the responsibility, so it is warranting some variance from the guidelines range."

The district court imposed a 192-month sentence—48 months below the 240-month guideline sentence—with a lifetime term of supervised release to follow.  It did not explain how many

of the 48-months were attributable to the § 5H1.4 departure and how many were due to the variance to give Mr. Guerra some benefit for his acceptance of responsibility.

This appeal followed.

## II

Mr. Guerra argues that the district court erred in failing to hold a *Kastigar* hearing. He asserts that the government breached the proffer letter agreement by using against him, at sentencing, evidence it obtained from the information he provided pursuant to the agreement. His argument with respect to breach is limited to the government's use of the video threatening the assassination of a Spanish judge. *See* Appellant's Br. at 17–18.[5]

The government responds that, even assuming there was any breach, Mr. Guerra suffered no harm. It points out that the district court expressly found that Open Source Jihad 1 and Open Source Jihad 2 were sufficient to apply the terrorism enhancement, and Mr. Guerra did not and does not object to the consideration of those two manuals because the government knew about them

---

[5] As noted, at the sentencing hearing Mr. Guerra agreed that the government could use Open Source Jihad 1 and Open Source Jihad 2 because it had them before the execution of the proffer letter agreement. And at oral argument, Mr. Guerra's counsel stated that there was also no objection to the government's use of Open Source Jihad 3, a manual on how to use arson to commit a terrorist act. As a result, the only evidence at issue on appeal is the video threatening the assassination of a Spanish judge.

16                     Opinion of the Court                     22-10419

before execution of the proffer letter agreement. *See* Appellee's Br. at 31–32.

## A

Our interpretation of the proffer letter agreement is plenary. *See United States v. Hill*, 643 F.3d 807, 874 (11th Cir. 2011). "And because due process requires us to enforce the government's agreement . . . , we apply the same rules and method of analysis to an informal grant of use or transactional immunity as we would to a formal grant." *Id.* (internal quotation marks and citation omitted).

"The construction of proffer agreements, like plea agreements, is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law." *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998). "This analogy, however, should not be taken too far. A hyper-technical reading of the written agreement and a rigidly literal approach in the construction of language should not be accepted. The written agreement should be viewed against the background of the negotiations. Any ambiguities in the terms of a proffer agreement should be resolved in favor of the . . . defendant." *Id.* at 709–10 (internal quotation marks and citations omitted). *See also* 3 Wayne R. LaFave et al., Criminal Procedure § 8.11(e) (4th ed. 2023) ("For informal immunity, unlike statutory use/derivative-use immunity, issues relating to the scope of the immunity cannot be answered by reference to the commensurate protection provided under the self-incrimination privilege. Here, scope may be broader or narrower than what would be required to supplant the privilege, and the crucial question is what scope was agreed to by the parties.").

If "the government breaches [a proffer] agreement [at sentencing], the defendant must either be resentenced by a new judge or allowed to withdraw his plea, regardless of whether the judge was influenced." *See United States v. Foster*, 889 F.2d 1049, 1055–56 (11th Cir. 1989) ("As the Supreme Court held in *Santobello v. New York*, 404 U.S. 257, 262 (1971), it makes no difference whether the judge was (or was not) influenced by information divulged through the government's breach."). And when the government's breach is after a trial, "the only available and sufficient remedy is to require specific performance of the agreement, which means that [the defendant] must be resentenced by a different judge." *Id.* at 1056.

The "consensus view" in the circuits seems to be that under *Santobello* "harmless-error analysis does not apply when the government breaches a plea agreement." *See United States v. Mosley*, 505 F.3d 804, 810 (8th Cir. 2007) (citing cases from ten circuits). But that view is not unanimous, at least not when it comes to the breach of a proffer agreement at sentencing. The Seventh Circuit, for example, has concluded that if the government breaches a proffer agreement at sentencing, thereby violating the provisions of U.S.S.G. § 1B1.8(a), the breach is subject to harmless error review. *See United States v. Bennett*, 708 F.3d 879, 886 (7th Cir. 2013).

**B**

The parties do not cite *Foster*. Nor do they discuss whether it precludes a harmless error analysis should we find that the government breached the proffer letter agreement. Fortunately, we do not need to consider *Foster* today, as we agree with the district

court that the government's use of the video threatening the assassination of a Spanish judge—with English subtitles inserted by Mr. Guerra—did not constitute a breach. We therefore do not address whether the district court's reliance on Open Jihad 1 and Open Jihad 2 for the imposition of the terrorism enhancement rendered harmless the government's alleged breach of the letter agreement.

As a reminder, the proffer letter agreement stated that "pursuant to [U.S.S.G.] § 1B1.8 . . . none of the information provided to the [government] during these debriefings shall be used against [Mr. Guerra] in determining the applicable guideline range." The letter agreement also contained limiting language providing that the government's promise "to not use statements against [Mr. Guerra] made during th[e] proffer d[id] not include statements concerning violent acts, or violence in any form."

The parties proceed on the assumption that, under the language of the proffer letter agreement, this violence exclusion applies to the use of statements or information at sentencing. *See* Appellee's Br. at 28–31; Appellant's Reply Br. at 4–7. We will do the same.

Mr. Guerra contends that the violence exclusion only covers violent acts or violence that he "participated in." Appellant's Reply Br. at 6. He says that the government drafted the violence exclusion only so that it could prosecute "someone being debriefed who reveals that [he] had committed violent acts or violence." *Id*. We disagree. Both the text of the agreement and the context of the

negotiations support the government's use of the Spanish judge video.

We turn first to the language of the proffer letter agreement. The exclusion's relevant phrase is "statements concerning violent acts, or violence in any form." The last clause is broad. *See* Cassell's Dictionary of English Idioms 301 (2002) ("in any shape or form" means "of any kind"); McGraw-Hill's American Idioms Dictionary 251 (4th ed. 2007) ("in any way, shape or form" means "in any manner"). One of the English subtitles that Mr. Guerra inserted in the video reads "you will die with a sticky bomb." *See* D.E. 102 at 34; D.E. 94-4 at 5. In our view, inserting that English subtitle in a video threatening the assassination of a Spanish judge falls squarely within the violence exclusion.

Our cases caution against a "hyper-technical reading" of a proffer agreement that does not consider the "background of the negotiations." *See Pielago*, 135 F.3d at 709. In this vein, Mr. Guerra argues that a broad reading essentially runs counter to the spirit of the agreement because it would "permit [the government] to utilize *anything* he told them during the briefing." Appellant's Reply Br. at 6 (emphasis in original). If that were the case, his argument seems to go, then why would he have ever entered into the agreement?

As Mr. Guerra acknowledges, however, the government sought his cooperation to identify other targets and thwart potential terrorist attacks. In exchange, the government agreed not to use his statements against him unless they concerned violent acts

or violence in any form.  Had the proffer sessions proved fruitful, he could have received a motion for a downward departure.  *See* U.S.S.G § 5K1.1.  That was the bargain, and because the government agreed not to use his statements unless the violence exclusion applied, the agreement was not illusory.  *See generally* Restatement (Second) of Contracts § 77 cmt. a (Am. L. Inst. 1981) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.").[6]

### III

Mr. Guerra also challenges the district court's application of the terrorism enhancement under U.S.S.G. § 3A1.4(a).  "A challenge to the application of the Sentencing Guidelines is a mixed question of law and fact."  *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004).  We review factual findings for clear error, but the "application of those facts to justify a sentencing enhancement is reviewed *de novo*."  *United States v. Castaneda-Pozo*, 877 F.3d 1249, 1251 (11th Cir. 2017) (citation omitted).  Contrary to Mr. Guerra's contention that the government's standard of proof is clear and convincing evidence, "our circuit's settled law is that the preponderance of the evidence standard is sufficient to establish the predicate facts for a sentencing adjustment or enhancement."  *United States v. Arcila Ramirez*, 16 F.4th 844, 855 n.8 (11th Cir. 2021).

---

[6] Even if we consider the Assistant U.S. Attorney's email, the result remains the same.  That email reiterated that the proffer letter agreement "specifically excludes violence."

The terrorism enhancement provides that:

(a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

(b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4.  Application Note 1 to § 3A1.4 explains that a "'federal crime of terrorism' has the meaning given [to] that term in 18 U.S.C. § 2332b(g)(5)."  In turn, § 2332b(g)(5) defines a "federal crime of terrorism" as an offense that:

(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and

(B) is a violation of . . . [18 U.S.C. §] 2339B (relating to providing material support to terrorist organizations)[.]

Mr. Guerra concedes that his conviction under 18 U.S.C. § 2339B(a)(1) is in violation of an enumerated statute under subsection (g)(5)(B).  As a result, only subsection (g)(5)(A) is at issue.

We recently held that the term "calculated" in subsection (g)(5)(A) imposes "an intent requirement," such that "the government must show that the defendant's *offense* was planned to influence, affect, or retaliate against government conduct, *even if that was not the defendant's personal motive*."  *Arcila Ramirez*, 16 F.4th at 854 (emphasis added).  Because defendants rarely admit their "full

knowledge or intentions," district courts may rely on "circumstantial evidence and reasonable inferences drawn from the facts." *Id.* For instance, though a defendant's "[p]ersonal motive is not relevant," his "*knowledge* that a terrorist organization solicited his actions to attack the government could demonstrate" that his conduct was "calculated to influence government." *Id.* (emphasis added).

The district court found that by translating and disseminating Open Source Jihad 1 and Open Source Jihad 2, Mr. Guerra was "knowingly *promoting* activities . . . . to *retaliate* against government conduct." D.E. 102 at 73 (emphasis added). It also found, alternatively, that by inserting English subtitles in the video threatening the assassination of a Spanish judge, Mr. Guerra was acting in a way "calculated to influence the conduct of government by intimidation or coercion[.]" *Id.*

Mr. Guerra's arguments against the terrorism enhancement can be summed up as follows: (1) being convicted under the material support statute does not *per se* warrant the enhancement; (2) to show retaliation, the government had to prove that he "intended to respond to specific government action;" and (3) the government failed to prove specific intent. None are convincing.

The first two arguments can be quickly dispensed with. As to the first, the district court never said anything to even remotely suggest that it was applying a *per se* rule. Its findings were thorough and clearly set out at the sentencing hearing. *See id.* at 69–74. As for the second, though we doubt that a defendant like Mr. Guerra

must be shown to be responding to a "specific government action," the record here supports such a finding. One example of sufficiently intentional retaliation provided by Mr. Guerra in support of his second argument is that of a defendant who attacked an embassy "to retaliate against the U.S. government['s] . . . presence in Libya." Appellant's Br. at 30–31. Here, through Open Source Jihad 2, Mr. Guerra promoted acts of terror in countries "where the government and public sentiment is in support of the Israeli occupation of Palestine [and] the American invasion of Afghanistan and Iraq . . . ." Under Mr. Guerra's proposed standard, that is specific enough.

The third argument requires more discussion, but it is nonetheless unavailing. We have not gone so far as to say that "specific intent" is required under § 2332b(g)(5)(A). In *Arcila Ramirez*, our most recent published case in this area, we held that the "calculated" prong of § 2332b(g)(5)(A) imposes an intent requirement such that "the government must show that the defendant's offense was planned to influence, affect, or retaliate against government conduct, even if that was not the defendant's personal motive." 16 F.4th at 854.

"[W]hether a defendant's offense is calculated (i.e., intended) to influence, affect, or retaliate against government conduct is a highly fact specific inquiry that requires examining the record as a whole." *Id.* There is no need for us to decide whether specific intent, in the form described by Mr. Guerra, is required. That is because the district court found that Mr. Guerra, by

24                     Opinion of the Court                  22-10419

inserting the English subtitles in the video threatening the assassination of a Spanish judge, had such an intent—his conduct was "calculated to influence the conduct of government by intimidation or coercion." D.E. 102 at 73. This finding is not clearly erroneous, as the targeted political killing of a judge—a government official—can be for the purpose of influencing, affecting, or retaliating against government conduct. *See United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) ("We may affirm a sentencing enhancement 'for any reason supported by the record, even if not relied upon by the district court.'") (citation omitted).[7]

Mr. Guerra attempts to minimize his conduct by characterizing himself as a mere translator and an oblivious operator of terrorist media accounts. The problem for Mr. Guerra is that he admitted to so much more in his factual proffer. He stipulated to, among other things, knowing that ISIS is an active foreign terrorist organization; directing and coordinating the efforts of ISIS media networks; recruiting other ISIS sympathizers; concealing his identity online and instructing his recruits on how to do the same; stating that "[w]ithout us [ISIS] in the online world is dead"; and, in addition to translating and disseminating Open Source Jihad 2 to a broader audience, "featur[ing] original content" to help others

---

[7]At oral argument, Mr. Guerra's counsel pointed to *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), as the best case on the issue of specific intent. *Stewart*, however, is distinguishable. In that case the government sought the terrorism enhancement even though it conceded that the defendant "ha[d] committed neither a federal crime of terrorism nor any other crime with the intent to promote such a crime." *Id.* at 138. That is not the case here.

22-10419                    Opinion of the Court                    25

evade detection online.   The fact of the matter is that Mr. Guerra's conduct places him a long ways away from being a mere translator or unknowing participant.

### IV

Mr. Guerra's third and final issue on appeal concerns the manner in which the district court applied the 3-level reduction for acceptance of responsibility.  Mr. Guerra argues that, under *Rodriguez*, 64 F.3d at 642–43, the district court "should have" varied downward so as to calculate the reduction from the 240-month statutory maximum sentence.[8]

In *Rodriguez*—a case decided when the Sentencing Guidelines were still mandatory—we held that a district court may, in its discretion, depart downward if the reduction for acceptance of responsibility gives the defendant no actual benefit because the guideline sentence far exceeds the statutory maximum.  *See id.* at 643.  We came to this conclusion because we thought that "the [Sentencing] Commission failed to consider that [U.S.S.G.] § 5G.1(a) [which provides that where the statutory maximum sentence is  less than the low end of the guideline range, the statutory maximum sentence becomes the guideline sentence] might

---

[8] Mr. Guerra argues for the first time in his reply brief that the district court misunderstood its authority to apply the reduction for acceptance of responsibility as a departure rather than a variance.  By not raising that argument in his opening brief, Mr. Guerra forfeited its consideration, and we see no reason to exercise our discretion to address it.  *See generally United States v. Campbell*, 26 F.4th 860, 873–74 (11th Cir. 2022) (en banc).  In any event, there is nothing in the record which suggests that the district court believed it could not depart.

operate to negate the [U.S.S.G.] § 3E1.1 [acceptance of responsibility] adjustment and undermine the 'legitimate societal interests' served by the adjustment." *See id.*

The Sentencing Commission in 2003—after *Rodriguez*, but still before the Supreme Court made the Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005)—promulgated U.S.S.G. § 5K2.0(d)(2). This provision prohibits district courts from departing from the applicable guideline range, outside of § 3E1.1, based on acceptance of responsibility. In other words, § 5K2.0(d)(2) appears to make § 3E1.1 the exclusive means by which a district court may account for acceptance of responsibility within the Sentencing Guidelines. The government, in fact, argues that § 5K2.0(d)(2) abrogated *Rodriguez*.

As far as we can tell, no other circuit has addressed the impact of § 5K2.0(d)(2) under a similar circumstance. Only the Third Circuit has come close to doing so. In a pre-*Booker* case, the Third Circuit held that "a sentencing court may depart downward when the circumstances of a case demonstrate a degree of acceptance of responsibility that is substantially in excess of that ordinarily present." *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir. 1992), *abrogated on other grounds by United States v. Douglas*, 885 F.3d 124 (3d Cir. 2018). Then, in a post-*Booker* case, the Third Circuit noted that a district court "reasonably questioned the continued vitality of *Lieberman* under § 5K2.0(d)(2)," but explained that it need only decide whether the district court "understood [§ 5K2.0(d)(2)] to mean that it lacked the authority to consider extraordinary acceptance of

22-10419                Opinion of the Court                    27

responsibility in issuing a *variance* pursuant to the [18 U.S.C.] § 3553(a) factors." *United States v. Severino*, 454 F.3d 206, 210 n.2 (3d Cir. 2006) (emphasis added).

We likewise see no reason to decide the effect of § 5K2.0(d)(2) on *Rodriguez*. As a procedural matter, the district court understood Mr. Guerra to be seeking a downward variance (and not a downward departure) to give him the benefit of his acceptance of responsibility, *see* D.E. 102 at 75, and Mr. Guerra's counsel did not tell the court that it was wrong to view the request that way.

The district court considered Mr. Guerra's acceptance of responsibility to be a mitigating factor under § 3553(a), among others, in varying downward 48 months, from 240 months to 192 months. Although the court did not say how many months of the variance were attributable to acceptance of responsibility and how many months were attributable to its departure under § 5H1.4, Mr. Guerra does not argue that the court committed any procedural error in that regard. His argument, in essence, is that by not varying downward more, the court abused its discretion and imposed a substantively unreasonable sentence.[9]

---

[9] To the extent that Mr. Guerra contends that the district court erred by not departing downward to account for acceptance of responsibility, that claim is not cognizable. *See United States v. Calderon*, 127 F.3d 1314, 1342 (11th Cir. 1997) (a refusal to depart downward cannot be a ground for appeal unless the district court believed it had no authority to depart).

A district court abuses its discretion and imposes a substantively unreasonable sentence "when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc) (citation omitted). We may only vacate a sentence "if [ ] we 'are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'" *Id.* at 1190 (quoting *United States v. Pugh*, 515 F.3d 1179, 1191 (11th Cir. 2008)). And "[a]lthough we do not automatically presume that a sentence within the guidelines range is reasonable, we ordinarily expect such a sentence to be reasonable." *United States v. Perkins*, 787 F.3d 1329, 1342 (11th Cir. 2015).

The district court considered Mr. Guerra's offense to be very serious, and believed it required a significant sentence. Nevertheless, it varied and departed downward 48 months below the 240-month statutory maximum sentence after expressly considering and weighing the § 3553(a) factors. We find no abuse of discretion with respect to substantive reasonableness. *Cf. United States v. Tounisi*, 900 F.3d 982, 987–88 (7th Cir. 2018) (upholding, as substantively reasonable, a 180-month sentence imposed on a defendant who violated § 2339B(a)(1) by attempting to provide material support to a foreign terrorist organization).

## V

We affirm Mr. Guerra's sentence.

**AFFIRMED.**