**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-11426

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

STEVE BONNER,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:23-cr-00136-CLM-GMB-1

————————————

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

A federal jury found Scott Bonner guilty of conspiracy to defraud the United States based on a scheme to sell stolen military scopes, in violation of 18 U.S.C. section 371. Before he was

indicted, Bonner entered into a proffer agreement with the government providing limited use immunity for statements Bonner made during his two proffer sessions. At trial, the district court determined that Bonner's opening statement and cross-examination of government witnesses triggered the proffer agreement's waiver provision, permitting the government to introduce fourteen of Bonner's proffer statements. The jury found Bonner guilty, and he was sentenced to thirty months' imprisonment. On appeal, Bonner argues that the district court reversibly erred in admitting the fourteen proffer statements because Bonner hadn't offered argument or evidence sufficient to trigger the waiver provision in the proffer agreement. Because we agree with the district court's reading of the waiver provision and find no abuse of discretion in its admission of the fourteen proffer statements, we affirm.

## FACTUAL BACKGROUND

For over a decade, a group of civilian law enforcement officers at Anniston Army Depot in Bynum, Alabama abused their positions of trust to gain unlawful access to various buildings at the Anniston Depot. The officers formed a conspiracy to steal approximately $4 million worth of government-owned AN/PVS-30 scopes (the "PVS-30s") and Advanced Combat Optical Gunsights (the "ACOGs"), which they then sold for profit or converted to their own personal use. Those officers included Jerry Baker, Kelvin Battle, Shane Farthing, and Eric Matraia.

The officers disposed of the government's property in several ways. Some of it they gave away to law enforcement officers

and agencies; some they sold through online websites; some they sold directly to customers in hand-to-hand transactions; and some they handed off to middlemen to deliver to Christopher Price, the owner of a military surplus store in Sylacauga, Alabama, who would then sell the items and share profits with the others. One of the middlemen was a  friend of Price's named Kenny Scott. The government accused Bonner of being another middleman.

Before he was indicted, Bonner, who was represented by counsel, agreed to be interviewed by federal agents and prosecutors at two proffer sessions, one on March 24, 2022, and the other on April 20, 2022. Before the sessions, the parties signed a proffer agreement in which the government promised that "[n]o [s]tatement made by [Bonner] or other information provided by [him] during the proffer will be used by the [g]overnment against [him] in any criminal or civil proceeding[,]" subject to several specified exceptions. One exception was the agreement's waiver provision, which stated:

> In the event that you appear as a witness at any judicial proceeding or submits [sic] any oral or written statement in conjunction with any future trial and/or sentencing, any statements or information provided during this proffer may be used for cross-examination and impeachment. In addition, such statements or information may be used to rebut any evidence or argument offered by him or on his behalf in connection with any trial and/or sentencing[.]

## PROCEDURAL HISTORY

In April 2023, a federal grand jury returned a two-count indictment naming Bonner as the sole defendant. In count one, the indictment charged Bonner with conspiring to embezzle, steal, purloin, and knowingly convert property of the United States worth more than $1,000, in violation of section 371. According to the indictment, Bonner's co-conspirators, some of whom were civilian employees of the Directorate of Emergency Services at Anniston, stole government-owned PVS-30s and ACOGs from government facilities. The indictment alleged that Bonner profited from the conspiracy by delivering some of the stolen property to Price and Scott and by selling some of it directly to buyers. In count two, the indictment charged Bonner with selling stolen property, in violation of 18 U.S.C. section 641.

Before trial, the district court granted the government's motion to dismiss count two without prejudice. On the same day, the government filed a motion in limine, arguing that Bonner had made inculpatory statements during his two proffer sessions and explaining that, were Bonner to open the door at trial, the government intended to introduce sixteen of his proffer statements under the agreement's waiver provision. The government's motion claimed that Bonner had made the following summarized statements at the proffers:

> 1. [Bonner] heard discussions with Kenny Scott about when and how they were getting the items they were getting.

2. [Bonner]'s only been doing it for the last couple of years.

3. [Bonner] realized that anything with a [Commercial and Government Entity ("CAGE")] number on it came from the government.

4. [Bonner] bought ACOGs and 120-130 PVS-30s from Kelvin Battle.

5. [Bonner] (falsely) denied selling items to anyone else.

6. [Bonner] became involved when Battle said he had access to items.

7. Battle delivered the items to [Bonner]'s house.

8. [Bonner] heard they were stealing items on Sundays.

9. Most of the ACOGs came from Eric Matraia through Kenny Scott.

10. [Bonner] and Battle were involved with 300-400 ACOGs. [Bonner] paid [Battle] $75-$200 each.

11. These items were the only items [Bonner] was involved with that left [Anniston] that [Bonner] knew shouldn't have left [Anniston].

12. When [Bonner] saw PVS-30s he knew they came from the government.

13. Law enforcement that received property a long time ago didn't know it was stolen from the government like the items [Bonner] saw.

14. Battle said Jerry Baker went in [Anniston] buildings on Sundays and used a swipe card to get in.

15. Battle brought PVS-30s to [Bonner]'s house twice. The total was 160-180. A call from Battle late at night would help pinpoint the date.

16. [Bonner] believes Price and Scott are trying to set him up; "not that [Bonner] didn't have nothing to do with it."

After reviewing the government's motion, the district court agreed that Bonner could trigger the waiver by offering argument or evidence that the government could rebut with Bonner's proffer statements but concluded that it "cannot determine whether Bonner or his attorneys will trigger the waiver provision until it hears the arguments, evidence, and testimony presented at trial." The district court also advised the parties that "[i]f the [g]overnment believes that any statement, argument, or evidence offered by Bonner has opened the door to information obtained during the proffer sessions, it should inform the court and defense counsel outside the presence of the jury," at which time the district court would "then decide whether the proffered information that the [g]overnment seeks to introduce can be classified as impeachment or rebuttal evidence[,]" and if so, the district court would determine whether "the evidence is otherwise admissible."

In his opening statement at trial, Bonner told the jury that: he was an expert gunman and "the fix-it guy"; other people had stolen from Anniston but that Bonner had never stepped foot on the facility; Battle knew that certain equipment had been designated for destruction, so he stole some of it and called Bonner because he knew that Bonner could fix military equipment; Bonner expected the government's witnesses to tell the jury that Battle had told Bonner that Battle had permission to take the items; and they should "[f]ollow the money" because Bonner's financial records would show that Bonner didn't have deposits in hundred-dollar bills like the conspirators and that Bonner hadn't received "millions of dollars" and wasn't "the one making all of the money" from conspiring to sell stolen military equipment.

The government called Battle as a witness. During Bonner's cross-examination of Battle, Bonner asked: "[s]o when you brought Steve Bonner those ACOGs that first time . . . you didn't say, [h]ey, these are stolen from the government, did you?" During his cross-examination of Battle, Bonner also asked, "[s]o at some point, you told Steve Bonner that you had permission to get items off of the base?" Finally, after Battle confirmed that he didn't have a financial agreement with Bonner, Bonner asked, "[y]ou don't know if he made a dollar do you? . . . [A]s you sit here today, you can't say that Steve Bonner made a nickel, a dollar, a hundred dollars?" Battle replied, "I cannot."

On the third day of trial, the government submitted to the district court a written list of Bonner's proffer statements and

renewed its request to introduce them in light of Bonner's opening statement and cross-examination, which the government argued had opened the door to introducing the statements as rebuttal evidence. In addition to the sixteen statements from its motion in limine, the government's list included an additional proffer statement by Bonner that he'd paid in cash for everything that he'd gotten from Battle.

The government argued that the proffer statements should be admitted because Bonner had triggered the waiver provision, first, in his opening statement by (1) indicating the government's witnesses were not credible, (2) asking the jury to "follow the money" and suggesting that Bonner did not financially benefit from the scheme, (3) telling the jury there was no evidence that Bonner had conspired with people who'd stolen equipment from Anniston, (4) suggesting that Bonner had been given the scopes to repair rather than sell, (5) suggesting that Battle had told Bonner and others that he had permission to take the scopes from Anniston; and second, during his cross-examination of the government's witnesses, by (6) asking character-related questions about whether Bonner was law-abiding, and (7) attacking government witness credibility via "hard impeachment."

In considering the government's renewed request to introduce the proffer statements, the district court read the proffer agreement as a contract and concluded the phrase "statements or information" in the waiver provision meant that the government could introduce only the specific portions of the proffer statements

necessary to rebut arguments made by Bonner at trial. The district court then instructed the government to go statement-by-statement and explain how Bonner had opened the door as to each of the seventeen statements the government sought to introduce as rebuttal evidence.

After hearing the government's arguments as to each statement, the district court determined that Bonner's opening statement and cross-examination had opened the door to fourteen out of the seventeen statements. The government called an agent to introduce the statements via direct examination. During closing arguments, the government again read the proffer statements admitted through the agent, stating that "[a]ll of these admissions by themselves would be sufficient to show that Mr. Bonner knew the unlawful purpose of the plan and willfully joined in it." The jury returned a guilty verdict. The district court sentenced Bonner to thirty months' imprisonment and ordered him to pay $1,873,200.00 in restitution.

## STANDARD OF REVIEW

We review de novo a district court's interpretation of a proffer agreement. *United States v. Hill*, 643 F.3d 807, 874 (11th Cir. 2011). We review for an abuse of discretion a district court's evidentiary ruling that a defendant's proffer statements are admissible. *See United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005); *United States v. Barrow*, 400 F.3d 109, 117 (2d Cir. 2005). A district court abuses its discretion in admitting evidence if it makes a clear

error of judgment or applies the wrong legal standard. *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

## DISCUSSION

Bonner challenges the district court's interpretation of the proffer agreement and its rulings that the fourteen proffer statements were admissible as rebuttal evidence. We address each argument in turn.

### The waiver provision

"Our interpretation of the proffer letter agreement is plenary." *United States v. Blanco*, 102 F.4th 1153, 1163 (11th Cir. 2024), *cert. denied*, 145 S. Ct. 774 (2024) (citing *Hill*, 643 F.3d at 874). "The construction of proffer agreements . . . is governed generally by the principles of contract law, as we have adapted it for the purposes of criminal law." *Id.* (internal quotation marks omitted) (quoting *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998)). But we've also cautioned that the analogy to contract law "should not be taken too far[,]" and "[a] hyper-technical reading of the written agreement and a rigidly literal approach in the construction of language should not be accepted." *Id.* (cleaned up) (quoting *Pielago*, 135 F.3d at 709). Instead, "the written agreement should be viewed against the background of the negotiations. Any ambiguities in the terms of a proffer agreement should be resolved in favor of the . . . defendant." *Id.* (cleaned up) (quoting *Pielago*, 135 F.3d at 709–10).

In *Pielago*, we relied on these principles to determine whether the government violated a defendant's proffer agreement

by calling as an adverse witness at the defendant's trial a co-conspirator whom the government indicted based on statements by the defendant in her proffer session. 135 F.3d at 709–10. There, the defendant's proffer agreement stated that "[n]o information or statement provided by [the defendant] may be used against [her] in this case or any other criminal investigation[.]" *Id.* at 710. In the next paragraph, the government "expressly reserve[d] the right to pursue any and all investigative leads derived from [the defendant's] statements or information and use such derivative evidence in any criminal or civil proceeding against her and/or others." *Id.* We determined that, by using the defendant's proffer statements to indict a co-conspirator who testified against her, the government "used" the defendant's information against her in the broadest sense of the term. *Id.* And relying on principles of contract law to interpret the proffer agreement, we concluded that the two paragraphs didn't conflict because the second paragraph could be reasonably read as qualifying the first instead of contradicting it. *Id.*

Here, Bonner takes issue with the district court's interpretation of the proffer agreement's waiver provision, arguing the district court "took an overly expansive view of the waiver provision[,]" which "paved the way for the introduction of otherwise inadmissible incriminating statements." We disagree.

Bonner's proffer agreement stated that the waiver provision was an exception to the promise not to use his proffer statements against him in criminal proceedings. That is, "statements or information" made by Bonner in the proffer sessions could be "used to

rebut any evidence or argument offered by him or on his behalf in connection with any trial[.]"  A plain reading of the proffer agreement confirms that the waiver provision was meant as an exception to the agreement's general promise of use immunity and would be triggered if Bonner sought to offer evidence or argument at his own trial that conflicted with statements Bonner had made in the proffer sessions.  *See Pielago*, 135 F.3d at 709–10.

The record confirms that the district court properly understood that our precedent requires applying principles of contract law "as we have adapted it to the purposes of criminal law" when interpreting proffer agreements like Bonner's.  *See Blanco*, 102 F.4th at 1163.  Applying those principles, the district court correctly read the waiver provision to permit the government to introduce only the specific portions of the "statements or information" to which Bonner had opened the door to rebuttal.  We see no error in the district court's interpretation of the waiver provision.

### The proffer statements

We review for abuse of discretion a district court's evidentiary ruling that a defendant's proffer statements are admissible. *See Henderson*, 409 F.3d at 1297.  "The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach." *Frazier*, 387 F.3d at 1259.  Under this standard, "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Id.* (quoting *Rasbury v. IRS,* 24 F.3d 159, 168 (11th Cir. 1994)). "As we have stated previously, the abuse of discretion standard

allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Id.* (quoting *Rasbury*, 24 F.3d at 168).

"We have explained that '[t]he purpose of rebuttal evidence is to explain, repel, counteract, or disprove the evidence of the adverse party, and the decision to permit rebuttal testimony is one that resides in the sound discretion of the trial judge.'" *Id.* at 1269 (internal quotation marks omitted) (quoting *United States v. Gold,* 743 F.2d 800, 818 (11th Cir. 1984)). "The underlying rationale is that when the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution's accepting the challenge and attempting to rebut the proposition asserted." *United States v. Hall*, 653 F.2d 1002, 1006 (5th Cir. Unit A 1981) (citing *United States v. Delk*, 586 F.2d 513, 516 (5th Cir. 1978)).

Bonner argues that the district court abused its discretion by admitting the fourteen proffer statements, maintaining that Bonner's opening statement and cross-examination only attacked the sufficiency of the government's proof as to each element and witness credibility, neither of which was sufficient to trigger the waiver provision and open the door to the government's introduction of the proffer statements as rebuttal evidence. We again disagree.

The record shows no error by the district court in ruling that the fourteen proffer statements were admissible because Bonner's opening statement and cross-examination presented to the jury an alternative factual theory that conflicted with his proffer

statements, triggering the waiver provision.  In his opening statement, Bonner put forward a theory that:  (1) he was the "fix-it guy" whose job was to repair scopes, which implied that Bonner was only involved in repairing scopes but not involved in their illegal resale; (2) Bonner expected government witnesses to say that Battle had told Bonner that Battle had permission to take the scopes from Anniston, which implied that Bonner didn't know the scopes were stolen; and (3) Bonner encouraged the jury to "follow the money," which implied that Bonner was an unwitting conspirator because he didn't profit from the conspiracy.  This amounted to an alternative factual theory that conflicted with the fourteen proffer statements in which Bonner admitted to knowingly purchasing government-owned scopes for resale that had been taken from Anniston without permission.  *See United States v. Scott*, 70 F.4th 846, 857–58 (5th Cir. 2023) (affirming district court's admission of proffer statements to rebut "new factual theory" put forward by defendant in opening statement because it went beyond attacking evidentiary sufficiency and because holding otherwise "would let defendants gut the waiver exceptions in proffer agreements with verbal tricks.").

Next, during his cross-examination of the government's witnesses, Bonner continued eliciting testimony by which he implicitly asserted facts to support the alternative factual theory at the heart of his defense.  For example, Bonner elicited testimony from Price and Battle concerning Bonner's skill in repairing scopes, supporting the suggestion in his opening statement that Bonner had received the scopes only to repair them.  Bonner also elicited testimony

from Battle and other government witnesses that, at some point in the past, Battle had told Bonner that Battle had permission to take the scopes from Anniston and that it was difficult to distinguish between military and civilian versions of the scopes, supporting the suggestion Bonner had already made in his opening statement that Bonner hadn't known that the scopes were stolen.  Finally, Bonner elicited testimony that Battle wasn't sure how much Bonner had profited from the scheme, supporting the suggestion in Bonner's opening statement that by "follow[ing] the money[,]" the jury could see that Bonner hadn't profited from the conspiracy and thus hadn't knowingly participated in it.  In other words, Bonner implicitly asserted facts during cross-examination to support his unwitting-conspirator theory of defense, and by doing so, Bonner opened the door to the government's use of whichever proffer statements conflicted with that theory.  *See Barrow*, 400 F.3d at 120 (distinguishing between cross-examinations that attack witness recollections or perceptions of events from those implicitly asserting an event did not occur and concluding that a defendant's theory presented in his opening statement and the implicit factual assertions elicited during cross-examination that reinforced that statement triggered his proffer agreement's waiver provision).

After reviewing the district court's admissibility rulings and mindful of the time taken by the district court leading up to and at trial to analyze the rebuttal issue, we cannot say that the district court's admissibility rulings fell outside the "the range of choice" rising to the level of "a clear error of judgment."  *See Frazier*, 387 F.3d at 1269; *Barrow*, 400 F.3d at 120 ("[B]ecause rebuttal is

necessarily a flexible concept and because trial judges are uniquely situated to assess the impact certain evidence or arguments have made on a jury, 'we are disinclined to overturn a district judge, who has determined—after watching a case unfold—that testimony properly rebuts an inference that a party's adversary has sought to make.'" (quoting *United States v. Tejada,* 956 F.2d 1256, 1267 (2d Cir. 1992))).

In sum, Bonner hasn't shown that the district court abused its discretion in admitting the fourteen proffer statements as rebuttal evidence.

### CONCLUSION

The district court correctly interpreted the waiver provision to allow the government to introduce only the specific portions of the proffer "statements or information" in the event Bonner opened the door to rebuttal. The district court did not abuse its discretion in admitting the fourteen proffer statements after it determined that Bonner had opened the door to rebuttal by putting before the jury an alternative factual theory that his proffer statements contradicted.

**AFFIRMED.**